RECEIVED

OCT 1 7 2018

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA, LOUISIANA

# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# ALEXANDRIA DIVISION

MICHELE PAYNE, ET AL.        CIVIL ACTION NO.:1:13-2732

VERSUS

ERICK K. FANNING, SECRETARY OF      JUDGE DEE D. DRELL
THE U.S. DEPARTMENT OF ARMY       MAG. JUDGE PEREZ-MONTES

## <u>RULING</u>

Plaintiffs, Michele Payne, Patricia Lynn Holaway, and Jacqueline Calhoun, filed suit on September 23, 2013, against the United States Department of the Army, through then Secretary, John M. McHugh[1]. (Doc. 1). All three plaintiffs, Caucasian women employed as counselors for the Army Substance Abuse Program ("ASAP") at Fort Polk, Louisiana, asserted claims for discrimination based on race, hostile work environment, and reprisal for engaging in prior EEO activity. Payne and Holaway further asserted claims for discrimination based on a perceived disability. All three women blamed their supervisor, Charlayne Lacking (African American), for the wrongful treatment.

Defendant filed a Motion to Dismiss and for Summary Judgment (Doc. 39) which this court granted in part and denied in part. (Doc. 88). Specifically, we dismissed, with prejudice, Plaintiffs' claims for constitutional discrimination and violation of the Whistleblower Protection Act. We further dismissed: (1) all of Calhoun's Title VII claims; (2) Holaway's Title VII claims for racial discrimination as to her pay grade, reprisals through ostracism and emails, discrimination in

---

[1] The lawsuit now proceeds against the U.S. Department of the Army though Secretary, Dr. Mark T. Esper who became the Secretary of the Army on November 15, 2017.

student loan reimbursement and benefits for her foot injury, and hostile work environment; and, (3) Payne's Title VII claims of retaliation (through issuance of a Letter of Counseling and a Letter of Reprimand), and hostile work environment. Thus, the only remaining claims for trial were claims asserted by both Holaway and Payne for retaliation pursuant to Title VII.

Although the nature of their remaining claims were the same, the specifics of and factual circumstances surrounding their claims varied significantly. For example, Holaway claimed she was retaliated against for participating in a "sensing session" and being named as a potential witness in Calhoun's EEO charge. As a result, she claimed she was denied training and was given an increased workload. In contrast, Payne claimed she was retaliated against for engaging in protected EEO activity, and then being denied training, placed on a focused professional practice evaluation (FPPE), and demoted. In light of the distinctions, we determined the matters should be tried separately with Holaway's remaining claims tried to the bench on June 24, 2017, and Payne's remaining claims tried to the bench on November 7, 2017.

## I.   Facts[2]

### A. Payne

Payne first joined Fort Polk's Army Substance Abuse Program ("ASAP") as a counseling psychologist in 2001. Payne and Lacking worked together as counseling psychologists from 2003 through 2009. Payne moved abroad to Japan during 2009 and returned to Fort Polk and ASAP during 2010. Upon her arrival and return to work, she learned Lacking had assumed the role as the Acting Clinical Director of ASAP.

In October 2010, ASAP's clinical services were realigned from the U.S. Army's Medical Command (MEDCOM) to the U.S. Army Installation Management Command (IMCOM). The

---

[2] Additional factual findings are set forth within the section *infra* entitled, "Law and Analysis."

realignment was significant because it changed operating procedures for ASAP clinics and their staff members. The increased job duties resulted in the need for a Supervisory Counseling Psychologist at Ft. Polk's ASAP. Lacking and her immediate supervisor, Thomas Gillard, ASAP's Program Manager, recommended Payne to fill the position and Director of Human Resources at IMCOM, Bobbie Stark (Caucasian), approved Payne's selection.

Payne accepted the position and commenced working as the Supervisory Counseling Psychologist on March 3, 2011. She accepted the position fully aware of the fact she had to successfully complete a year-long probationary period in order to retain the position on a permanent basis.

Within a month or two of starting, Lacking documented certain deficiencies with Payne's performance, and identified them to Payne. Payne accepted the critiques and made no contemporaneous overtures that the critiques were unwarranted or based on any type of discrimination or harassment.

In June 2011, the Army announced it would fill Lacking's position, Clinical Director of Fort Polk ASAP, on a permanent basis and opened an application process. Both Payne and Lacking applied for the position and Lacking was ultimately chosen. A month thereafter, the tension between Lacking and Payne began.

The first instance arose out of a July 13, 2011, email Lacking sent Payne directing her to remove from her office door a flier that advertised a "Tea Party" sponsored event. In the email Lacking advised that removal of the flier was warranted as it posed a violation of the Hatch Act (which prohibits political activity by a federal employee) and failure to remove the poster could result in discipline and/or termination. Unbeknownst to Payne, Lacking's directive had come

down through the chain of command and was at the behest of Bobbi Stark, Director, Human Resources.

Although Payne complied with Lacking's directive, she vehemently disagreed with the assessment that the flier and/or the posting thereof violated the Hatch Act. Convinced that Lacking was discriminating and/or retaliating against her, Payne set out to prove Lacking wrong. She first reached out to Augustine Ross, who handled human resource matters for the Civilian Personnel Advisory Center (CPAC) at Ft. Polk, for confirmation that Lacking's assessment was incorrect. When that inquiry went unanswered, Payne contacted a Fort Polk Installation attorney for his opinion. Upon receiving the attorney's response on July 19, 2018 that there was no violation of the Hatch Act, Payne quickly forwarded the email response to Lacking.

This type of reaction by Payne to directives from her supervisor continued through her tenure at ASAP. As she received critiques and corrections from Lacking, she would reach out to Lacking's supervisors, Thomas Gillard and/or Bobbi Stark. The first documented instance in this case was Payne's September 1, 2011, email to both Gillard and Stark claiming she was being stifled as a supervisor; therefore, she said she was seeking other employment. Payne then complained in October 2011 when she learned she was placed on Focused Professional Practice Evaluation (FPPE).[3] Payne immediately blamed Lacking despite the fact it was Dr. Patrick Hayes, the then outgoing Chief of the Department of Behavioral Health at Bayne-Jones Army Community Hospital (BJACH)[4] and the Acting ASAP Clinical Consultant, who made the recommendation. Although the quality assurance he conducted was in follow up to Lacking's request, he conducted

---

[3] A FPPE is a period of intense review of a practitioner. As outlined in the memorandum advising Payne of placement on FPPE, she was advised her placement was to ensure she provided optimal care to her patients and that she did not exceed the limits of her privileges. She was further advised that her period of review included chart review, continuing education training, and a review of ASAP's regulations, standard operating procedures, and clinical professional ethics.

[4] BJACH provides healthcare to the Fort Polk community.

an independent review of Payne's charts and found sufficient deficiencies in four of the seven charts he reviewed. Based upon this 60% rate of deficiency by a supervisor, Dr. Hayes recommended to the BJACH Credentialing Committee and BJACH Commander that Payne be placed on FPPE. The Committee and Commander then reviewed the recommendation and voted to place Payne on FPPE for three months and to relieve her of her supervisory duties during that time.

These assessments and the actions taken by Lacking were further corroborated by Scott Mims, IMCOM's Clinical Quality Program Manager, who conducted an on site inspection in the fall of 2011. While he did not remember Payne specifically from his review, he did recall that the compliance with IMCOM's standards at Ft. Polk ASAP was between 15% and 20% where a rating of 90% was considered minimally acceptable. He further testified that during his visit, he found the ASAP staff members resistant to change (wanting to conduct the clinic under prior MEDCOM protocol), and the clinic lacked consistency, continuity, and failed to meet IMCOM standards of care.

Unwilling to accept that her performance as a supervisor was deficient, Payne contacted the EEO on October 20, 2011, to report she was being discriminated against by Lacking based on race. In support of her claim, she referenced the September 12, 2011, letter of warning issued to her by Lacking for failing to follow the orders given to her by Lacking, her placement on FPPE, and being relieved of her supervisory duties.

The EEO report conducted in response to this informal complaint indicated the EEO counselor contacted "management" about the complaint. Lacking and Stark denied knowledge of this initial contact with the EEO while Gillard testified that he received numerous complaints from

and regarding Payne. Therefore, we assume for discussion purposes that the referenced "management" was likely Mr. Gillard.

Mr. Gillard stated that he investigated the complaints he received from Payne as well as the many complaints lodged against her. Despite his investigation, he did not find improper action undertaken by Lacking. Instead he noted Payne's deficient performance and Lacking's continued efforts to attain compliance with IMCOM protocol. Among those who complained about Payne was one Karla Gralapp, a fellow counselor, who credibly testified at trial on behalf of Payne. Ms. Gralapp's testimony was that she viewed Payne as antagonistic during her tenure at ASAP. Once Payne was gone, however, she began to see that Lacking insisted upon having the office run her way at all times, and that if one crossed Lacking, she would quickly fall out of favor and be unfairly watched for any mistakes. Nevertheless, Ms. Gralapp did not see Lacking's tyrannical style to be based on discriminatory animus.

Despite Payne's continued counseling by Lacking and her placement on FPPE, by December 2011, it appeared to Lacking that Payne's performance was not improving. Accordingly, during this time, Lacking contacted the Credentialing Committee who voted to extend Payne's FPPE through March 31, 2012. Additionally, Lacking conducted Payne's annual review. While Lacking's prior review of Payne as a Counseling Psychologist resulted in a favorable review, this review by Lacking of Payne as a supervisor resulted in an overall assessment of "1", the lowest possible rating. In light of that assessment, Payne became alarmed that she might be terminated.

On February 6, 2018, Payne filed her formal complaint with the EEO claiming reprisal for contacting their office on October 20, 2011, regarding the alleged race discrimination and harassment. Therein, she cited the letter of warning, and her FPPE status as evidence. She also

added new allegations regarding an incident where she claimed she was "set up" by Lacking to fail and given an overall rating of 1 on her performance review.

Within a week of the EEO filing, Lacking showed up at Payne's office door. Lacking testified the reason was that she was responding to an email from Payne requesting clarification on the use of a certain IMCOM form. Payne contrarily testified she believed Lacking was there to fire her. Regardless, the women both recount Payne's immediately going on the defensive; demanding Lacking leave her office; and, yelling that she knew Lacking was trying to fire her. When Lacking did not leave, Payne approached the door and closed it in Lacking's face. Because of this unprofessional behavior display by Payne, Lacking issued a letter of warning generating further distrust between the two.

The following month, Payne's probationary period as a supervisor expired. Faced with her continued shortcomings and failure to successfully complete the probationary period, Payne was returned to her position as Counseling Psychologist. However, the demotion was in title only. There was no demotion in pay or benefits as far as the record shows.

In April 2012, tensions rose again when Payne violated a direct order issued by Lacking to transfer a patient to her co-worker Karla Gralapp. According to Payne, the patient was in a fragile state, trusted only her, and she feared that the patient might hurt himself if transferred. However, the testimony at trial established that once Payne had stabilized the patient, she followed up with him directly. It was this follow up which crossed the line and was a direct violation of Lacking's orders. Accordingly, again, after consulting with Gillard and Ross, Lacking decided that she must issue a formal disciplinary act by issuing a Letter of Reprimand.

During this time and continuing into the summer, Payne pursued her EEO charge and continued to voice that she was being harassed, discriminated against, and subjected to continuing

reprisal. Gillard and Stark continued to look into the matter. Based on all of the continued complaint by and against Payne, Stark decided to bring in an EEO counselor to conduct a "sensing session." The expectation was that the EEO counselor would be able to speak to ASAP staff members and get a feel for the problem in the office, in hopes of resolving the obvious conflict.

The session held on July 19, 2011, was slow to start, so Payne initiated the conversation by acknowledging she was the reason the session was called. Once the ice was broken, the group discussed issues related to poor morale, favoritism, inappropriate dress, Lacking's style of ruling with an iron fist, and race discrimination. The EEO counselor listened to all of the complaints but in a report to Stark recited no evidence of race discrimination. However, Payne continued to pursue her complaints and, according to Stark, demanded that she be transferred from Lacking's supervision.

As no other supervisor existed within the ASAP program, Stark determined that Payne should be moved to the Directorate of Family Morale, Welfare, and Recreation, Army Community Services. In a memorandum to Payne dated September 17, 2012, Stark detailed the set of duties of her new detail including, among other things, that she schedule, prepare for, and conduct classes related to stress management, anger management, marriage enrichment/education, parenting education, the relationship between alcohol/other substance abuse and domestic violence, communication, and other family life skills building classes. Stark further advised Payne that she was to report for duty the following morning; however, Payne was a no call, no show. When Stark inquired via email, Payne advised that she had an appointment with EEO which lasted most of the day. She further advised that she planned to go the following day to the ASAP office and then return to the EEO for a follow up appointment.

Payne asked Kristine Capitano, her new supervisor, almost immediately, for extended leave. Initially, Capitano assented; however, she later learned that because the leave exceeded 40 hours, Stark would need to approve the leave. Accordingly, Capitano approved Payne's request for leave through October 19, 2012, and directed Payne to submit her request for additional leave to Stark.

On October 19, 2012, Payne made a verbal request for an extended leave of 248 hours of paid annual leave. Accompanying her request was a letter from her personal counselor, Mark D. Ifland, LPC, LMFT, who recommended Payne take an indefinite leave of absence as she was unable to work because of the severe stress she suffered as a result of her "hostile work environment." Based Payne's request, Stark granted Payne paid leave from October 22 through 26, 2012, based on the request and the letter, Stark also granted her sick leave from October 29 through November 2, 2012. Stark then asked via a letter dated October 30, 2012, for additional information so Stark could further consider an even longer extended leave request.

Also around this time, Stark recommended Payne into the BJACH Provider Health Care Program[5] based upon Payne's request for extended leave and supporting documentation from her counselor. Payne vehemently opposed her enrollment in the Provider Heath Care Program as she believed the program was reserved for those with substance abuse problems and severe impairments, not severe stress because of a poor work environment. Payne and her attorney met with Thomas Starkey, Chairperson of the Provider Health Care Program, to voice her concerns and explain that her placement in the program was another act of retaliation. Despite her complaints, Payne was enrolled in the program as evidenced by a memorandum dated November 20, 2012.

---

[5] The BJACH Provider Health Care Program was intended to

Alhough Payne responded to the request for additional information regarding her leave request on November 15, 2012, she ultimately issued an email to Stark on November 27, 2012, tendering her resignation effective November 30, 2012.

**B. Holaway**

Holaway was hired as a counselor for ASAP on January 29, 2011. She worked at ASAP for eighteen months without any significant issues but in August 2012, she noticed the number of cases she was assigned and the difficultly of the assignments appeared to exceed those of other counselors. This she regarded as improper disparate treatment. Holaway attributed the disparate treatment to two occurrences. The first was her participation in the above-mentioned sensing session held July 19, 2012, and the other was the fact she was approached by an EEO counsel for an interview regarding an EEO complaint filed by yet another counselor, Jacqueline Calhoun.

During the sensing session, Holaway voiced her concerns about apparent dress code violations by coworkers in the ASAP office, favoritism, inequality in student loan repayment[6], pay settings, and being denied the opportunity to file a "Notice of Traumatic Injury" form when she broke her foot in a work place slip and fall.

On or about August 6, 2012, an EEO counselor approached Holaway for an interview regarding those certain complaints lodged by Jacqueline Calhoun. However, Holaway refused to participate for fear of being retaliated against.

On August 20, 2012, Holaway tendered her resignation, effective immediately, citing personal reasons. She also contacted the EEO to file a formal complaint alleging discrimination based on disparity in student loan reimbursement, pay grade, and benefits.

---

[6] Holaway's claims regarding alleged inequality in student loan repayment were previously dismissed by this court's judgment issued August 23, 2016. (Doc. 88).

## II.    Law and Analysis

### A.    Retaliation

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment… because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. §2000e-3(a).

Retaliation may be proven through either direct or circumstantial evidence, but when there is no direct evidence (as is the instant case), the burden shifting framework of Mc Donnell Douglas Corp. v. Green, 411 U.S. 792 (1973), is used to evaluate the circumstantial evidence provided.  See Turner v. Baylor Richardson Medical Center, 476 F.3d 337, 345 (5th Cir.2007) (citations omitted). This burden shifting framework requires a plaintiff show: (1) she participated in an activity protected by Title VII; (2) her employer took an adverse action against her; and, 3) a causal connection exists between the protected activity and the materially adverse employment action. McCoy v. City of Shreveport, 492 F.3d 556-57 (5th Cir.2007).  A materially adverse employment action is one that would dissuade a reasonable worker from making or supporting a charge of discrimination.  Burlington N. v. Santa De. R.R. v. White, 548 U.S. 53, 64.  To establish the requisite causal connection between the protected activity and adverse employment action, the plaintiff must establish her protected activity was the "but for" cause of the adverse employment decision.  University of Texas Southwestern Medical Center v. Nassar, 570 U.S. 338, 361 (2013).

Once this showing is made, the burden shifts to the employer to articulate a legitimate non-retaliatory reason for the employment action.  Gee v. Principi. 289 F.3d 342, 345 (5th Cir.2002). If the defendant meets its burden, the plaintiff must prove the proffered reason is not true, but instead a pretext for the real retaliatory purpose.

### i. **Payne**

The retaliation claims before the court at the commencement of trial were whether Payne was retaliated against though the denial of training opportunities, placement on FPPE, an unfavorable performance review, and demotion from her position as a supervisor to a counselor. However, during the trial, Payne expanded her allegations to include retaliation for posting the Tea Party poster, filing complaints with the EEO, being transferred to another department, and being constructively discharged. These complaints are addressed seriatim:

- Denial of Training

Payne also contends she was denied two training opportunities by Lacking, including "Civilian Leader Intermediate" training and attendance at an alcohol and drug conference. Lacking denied the first in February 2012 citing the fact Payne had not completed her probationary period and was not yet deemed a supervisor; thus the training was premature. Attendance at the drug and alcohol conference was denied in April 2012 because of a mismatch in the timing of the training. While Lacking denied the request, she told Payne to choose another date.

A denial of training does not constitute an adverse employment action when the training is peripheral to the plaintiff's main duties and the plaintiff produces no significant evidence that the denial of such training would tend to affect employment status or benefits. Shackelford v. Deloitte & Touche, LLP, 190 F.3d 398, 406-07 (5th Cir.1999). Payne has not established in either instance that the failure to provide either of these trainings negatively impacted her. The reason for the first denial was because she was not yet elevated to a position where the training was warranted. The second denial was followed by a request for another date. Payne presented that follow up request and Lacking approved her attendance for a training in Las Vegas in September 2012. Payne

attended that session. Thus, Payne has failed to establish a *prima facie* case for retaliation based on denial of training.

- Tea Party Poster

Payne cannot establish *prima facie* case of retaliation based on the email and conduct pertaining to her posting of the Tea Party flier. The posting of the flier is not a protected activity under Title VII and the incident predates any proven effort by Payne to engage in protected activity.

- FPPE Placement

As with the Tea Party incident, Payne cannot establish a *prima facie* case regarding her initial placement on FPPE status. Again, Payne did not undertake any efforts to engage in a protected activity under Title VII prior to the program being initiated. Also, FPPE placement was warranted based on Payne's performance.

- FPPE Extension

To expand, in December 2011, Lacking suggested to the BJACH Credentialing Committee that Payne had not complied with the terms of the FPPE and believed it should be continued. After a review by the committee, they agreed and extended the FPPE through March 31, 2012. This action took place within two months of Payne's contacting the EEO to file an informal complaint claiming race discrimination by Lacking.

There is no evidence that Lacking knew Payne had contacted the EEO on October 20, 2011. While there is evidence that Gillard was likely informed, there is nothing to show that he advised Lacking of the protected activity. Even if knowledge could be established, there is sufficient evidence dating back to April 2011 establishing Payne was not following protocols implemented by IMCOM, and that the FPPE placement and extension was warranted.

On May 31, 2011, Lacking provided a critique of her performance via a midyear review. She was counseled about her deficiencies on numerous occasions, and when the counseling did not prove successful, Lacking sought the help of Gillard, Stark, and ultimately Dr. Hayes. As we noted above, it was Dr. Hayes who recommended her placement in the initial FPPE and the Credentialing Committee who voted in favor of placement and renewal of the FPPE. Thus, Payne has further failed to convince us of any negative intent on the part of Lacking which would have led her to place Payne on FPPE or to extend that placement. The decisions regarding FPPE were made by a number of people upward in the chain of command. There is no evidence that Gillard, Stark, Dr. Hayes, or anyone on the Credentialing Committee harbored animosity toward Payne. Even if Lacking had retaliatory animus, there is no evidence that she used Gillard, Stark, Dr. Hayes, or those on the credentialing committee to ensure Payne was placed on FPPE status.

Payne has also failed to refute the overwhelming evidence that her performance as a supervisor was deficient. Although Gralapp testified Payne was a good <u>counselor</u>, Lacking confirmed that her issues had to do particularly with her abilities in her role as a <u>supervisor</u>.

- Performance Review

Payne supposedly learned from an anonymous source in December 2011 that she received an unfavorable performance review. Confirmation of the same was provided by Lacking in January 2012. The testimony at trial was that Lacking provided two ratings of "3", a rating of "2", and a rating of "1" on the four sections of the performance review. However, a rating of "1" in any single category resulted in an overall rating of "1." Lacking testified she was unaware of this or she would have reconsidered the rating of "1" in the category of supervision.

For the same reasons stated above, we do not find evidence that Lacking had knowledge of Payne's visit to the EEO in October 2011; however, assuming she did, Payne still cannot

14

establish a claim of retaliation based on this event. While we find an overall rating of 1 on a performance review to be a materially adverse employment action, the defendant has presented more than sufficient evidence to support a finding that the poor rating, was based on Payne's poor performance as a supervisor. The testimony at trial was that the transfer of ASAP function from MEDCOM to IMCOM brought significant required procedural changes to ASAP. The Army's apparent intent was to standardize care across all of the clinics so new protocols were out in place; the paperwork was immense; counselors debated that the paperwork was the focus rather than good patient care. Yet, national reviews showed Ft. Polk's ASAP was falling far below the minimally accepted standards. Lacking was the one expected to provide results. As such, she demanded compliance and near perfection.

Despite repeated attempts to explain to Payne why her performance was falling short, Payne never fully complied with the requirements for a counselor, much less for a supervisor. Payne had been in the supervisory role for approximately nine months at the time of the poor review and had even been under the FPPE umbrella. Yet she continued to perform at a deficient level. Accordingly, we find the assessment of her skills as a supervisor at a level of "1" was warranted under the circumstances.

Payne has not refuted this evidence with anything to establish negative animus on the part of Lacking with respect to Payne's engaging in protected activity. Thus, there is no evidence to establish the Army's explanation is pre-textual. Payne's demotion was implemented in March 2012 after she made a formal complaint to the EEO, citing her prior race discrimination claims and asserting claims of retaliation for contacting the EEO regarding those claims. It is unknown exactly when Lacking received notice of the formal complaint, but she knew when a counselor appeared asking her questions about Payne's poor performance review rating.

Assuming notice had been received by the time of the demotion, Payne could have established causation based upon the temporal proximity. However, she has failed to overcome the overwhelming evidence that the demotion (or rather the failure to make her a permanent supervisor) was warranted for her continued failure to perform well in her supervisory role.

Further, the evidence in the record was that the determination to demote Payne came from CPAC and Ms. Ross, not from Lacking. No evidence establishes negative animus on behalf of Ms. Ross nor that Payne's demotion in any way related to negative feelings Lacking may have held against Payne.

- Letter of Reprimand

The letter of reprimand was issued by Lacking following a specific incident wherein Payne refused to follow orders to transfer a patient. According to Payne, her continued contact with the patient was based wholly on an emergent situation. However, in her account of the story, she acknowledged that she stabilized the situation, did not tell Lacking or the new counselor about her continued interaction with the patient including following up with the patient the following day. Evidence at trial established that an "emergent situation" ceases to exist once a patient and the situation is stabilized. Thus, it was a direct violation of Lacking's order for Payne to continue to follow up with the patient, particularly since she failed to contact the acting counselor and/or Lacking to advise of the situation. Thus, Lacking was justified in issuing a formal disciplinary action in the form of a letter of reprimand. Payne presented no argument nor evidence countering the reasoning for the disciplinary action to establish it was pretext. As such, this claim fails.

- Transfer

On its face, the transfer of Payne to another department, the Army Community Services, Directorate of Family Morale, Welfare, and Recreation by Stark is most troubling of all of the bases of her claims. "Whether a particular reassignment is materially adverse depends upon the circumstances of the particular case." Burlington, 548 U.S. at 71. "In determining whether the new position is objectively better, a number of factors may be relevant, including whether the position: entails an increase in compensation or other tangible benefits; provides greater responsibility or better job duties; provides greater opportunities for career advancement; requires greater skill, education, or experience; is obtained through a complex competitive selection process; or is otherwise objectively more prestigious." Alvarado v. Texas Rangers, 492 F.3d 605, 613 (5th Cir.2007).

At trial. Payne failed to prove via evidence, that the transfer to this position was actionable. While she claimed the position did not allow her to perform counseling, she failed to explain any further. Her own testimony revealed that she did not even make a sufficient effort to understand the particulars of the new job as she sought a leave of absence nearly immediately upon receiving the assignment. As the record is devoid of any evidence which would allow the court to determine the material adversity of the new position, we are unable to find the transfer to be a retaliatory action.

- Provider Health Care Program

Finally, Payne's complaints that her enrollment in BJACH's Provider Health Care Program was based upon retaliatory motives lack merit. The evidence shows that Lacking was no longer Payne's supervisor at the enrollment in the program was considered. Payne was assigned to a completely different supervisor in a completely different department. Though Stark remained in the upward chain of command, the record is completely devoid of evidence that Stark had any

negative animus of her own against Payne or that she acted on behalf of another. Stark's recommendation for enrollment in the program was a result of Payne's own comments and conduct. Based on her continued statements that she was in need of an extended leave of absence because of stress and her counselor's confirmation of the same, Stark believed it was in Payne's best interest to become a part of the program. Lieutenant Starkey, Chair of the Provider Health Care Program agreed, and the enrollment was confirmed.

### ii. Holaway

Holaway claims she was improperly denied training opportunities and Lacking increased her case load. Again, we address each part of her claims:

- Denial of Training

Holaway contends Lacking took a materially adverse employment action against her, in denying her training, because she participated in the "sensing session" on July 19, 2012. Holaway claims she was denied training twice: on July 31, 2012, and September 6, 2012.

As stated *supra* the denial of training is not a materially adverse employment action if the training is peripheral to the plaintiff's main duties and the plaintiff produces no significant evidence that the denial of such training would tend to affect employment status or benefits. Shackelford v. Deloitte & Touche, LLP, 190 F.3d 398, 406-07 (5th Cir.1999). The evidence presented by Holaway regarding the denial of training does not establish either of these factors. In fact the evidence provided shows that Holaway was not provided the opportunity to attend the July 31, 2012 training as she had already been authorized to attend, and did attend, two prior trainings. Funds for training were scarce, and Lacking wanted to ensure that everyone had equal an opportunity to attend trainings. As for the September 2012 training, Holaway withdrew her request

to attend. Also, that training would have occurred after she tendered her resignation. Accordingly, Holaway has failed to establish a *prima facie* case of retaliation based on denial of training.

- Increased Caseload

Up to trial, the evidence established that the case load carried by Holaway from May 2012 through August 2012 was roughly average, not the highest as she has contended. Because there was no pretrial evidence of the comparative caseloads carried by individual counselors through August, we allowed the issue to proceed to trial.

At trial, documentation introduced into evidence showed that Holaway's caseload remained on an average with the other ASAP counselors. Thus, she has failed to establish a *prima facie* case of retaliation based on her caseload.

### B. Constructive Discharge

Constructive discharge occurs when the employer makes working conditions so intolerable that a reasonable employee would feel compelled to resign. Hunt v. Rapides Healthcare Sys., LLC, 277 F.3d 757, 771 (5th Cir.2001) abrogated on other grounds; Shafer v. Army & Air Force Exch. Serv., 376 F.3d 386, 397 (5th Cir.2004), opinion clarified, 2004 WL 2107672 (5th Cir.2004). In evaluating a constructive discharge claim, the court considers whether there has been: "(1) a demotion; (2) a reduction in salary; (3) a reduction in job responsibilities; (4) a reassignment to menial or degrading work; (5) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (6) offers of early retirement that would make the employee worse off whether the offer was accepted or not." Id. at 771-72. The legal standard is that of a "reasonable employee": Would a reasonable employee in the plaintiff's position have felt compelled to resign?

### i. Payne

Payne has failed to establish her demotion was based on retaliation, that she suffered a reduction in salary or job responsibilities, that her reassignment was to menial or degrading work, that she was badgered, harassed, or humiliated by Lacking or any other employee of the Army with the intent of having her resign, and/or that she was offered an early retirement. What has been established is that Payne was as headstrong as Lacking. The two had both applied for the position as the director of ASAP. When Payne was passed over, tensions began and with each action undertaken by Lacking in the supervisory role, Payne grew more resentful. Payne believed then and still apparently does, that the protocols enacted by IMCOM and enforced by Lacking were substandard to those she believed in and used under MEDCOM. While we understand Payne's stated desire to put service above box checking, the job requirements and methods were not her call to make. Her repeated refusals to comply with her supervisor's directions actually resulted in her being passed over for a permanent position as a supervisor and ultimately led to her resignation.

Finally, while we do not find any of Lacking's conduct actionable under Title VII, we find her relatively tyrannical style of ruling to be contrary to that of an effective leader. There is sufficient evidence that several other qualified counselors left the employ of ASAP because of leadership style which is a blemish on both Lacking and ASAP's records.

### ii. Holaway

In light of our findings herein and previously on the motion for summary judgment, there is no evidence to support a claim by Holaway that she was constructively discharged. It is our finding that a reasonable employee would not have taken offense nor felt intimidated by any of the actions undertaken by Lacking. While we find Holaway to be credible in her beliefs, we believe

it is the personalities of the two women and Payne's influence over her which left Holaway 's

deciding to leave ASAP. Such does not rise to the level of constructive discharge under Title VII.

**III.** **Conclusion**

As the overwhelming weight of the relevant and credible evidence supports the defendants'

arguments that it had legitimate reasons for the adverse employment actions cited by Payne and

because Holaway has failed to establish a *prima facie* case in support of her claims, the court finds

that both the plaintiffs' claims shall be denied and dismissed with prejudice.

The court will issue a judgment in conformity with these findings.

**SIGNED** this __17th__ day of October, 2018, at Alexandria, Louisiana.

**JUDGE DEE D. DRELL**
**UNITED STATES DISTRICT COURT**